IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:18-CR-319 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 |
| | ) | (Conspiracy to Commit Insider Trading) |
| NAN HUANG, and | ) | |
| BO NAN HUANG, | ) | Counts 2 – 21: 15 U.S.C. §§ 78j(b), 78ff; |
| also known as "Bonan Huang," | ) | 17 C.F.R. § 240.10b-5 |
| | ) | (Insider Trading) |
| Defendants. | ) | |
| | ) | Count 22 – 26: 18 U.S.C. § 1957 |
| | ) | (Unlawful Monetary Transactions) |
| | ) | |
| | ) | Forfeiture Notice |

## INDICTMENT

August 2018 Term - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

Unless otherwise noted, at all times relevant to this Indictment:

1.      Capital One Financial Corporation was a diversified bank holding company that offered, through its subsidiaries, a broad array of financial products and services to customers, including credit cards.  Capital One Bank (USA), N.A., was a subsidiary of Capital One Financial Corporation which offered credit and debit card products.  Capital One, N.A., was a subsidiary of Capital One Financial Corporation which offered a broad spectrum of banking products and financial services to consumers, small businesses, and commercial clients.  Capital One Services, LLC was a subsidiary of Capital One, N.A.

1

2.     Capital One Financial Corporation and its affiliated entities, including Capital One Bank (USA), N.A., Capital One Financial Corporation, and Capital One Services, LLC (collectively hereinafter referred to as "Capital One") maintained offices within the Eastern District of Virginia and elsewhere.

3.     As a part of its business, Capital One maintained a large database that recorded the credit card and debit card activity of its millions of customers. This database could be queried to search for and aggregate credit card and debit card sales data according to a number of parameters, including by the name of a company or merchant, and by transaction date. The information contained in this database was nonpublic.

4.     Defendant NAN HUANG was employed by Capital One Services, LLC as a senior data analyst in Richmond, Virginia, within the Eastern District of Virginia. As a senior data analyst, NAN HUANG had access to Capital One's nonpublic database of credit card and debit card activity and was authorized to use that database to perform his official job duties. By accessing Capital One's database, NAN HUANG learned material, nonpublic information about scores of publicly traded companies and the sales data of those companies.

5.     As an employee of Capital One Services, LLC, defendant NAN HUANG owed fiduciary and other duties of trust and confidence to Capital One and its affiliates to maintain the confidentiality of the material, nonpublic information he obtained during the course of his employment. Among other things, these duties prohibited NAN HUANG from disclosing or trading securities on the basis of this information.

6.     Defendant BO NAN HUANG, also known as "Bonan Huang," was employed by Capital One Services, LLC as a senior data analyst in Richmond, Virginia, within the Eastern District of Virginia. As a senior data analyst, BO NAN HUANG had access to Capital One's

nonpublic database of credit card and debit card activity and was authorized to use that database

to perform his official job duties. By accessing Capital One's database, BO NAN HUANG

learned material, nonpublic information about scores of publicly traded companies and the sales

data of those companies.

7.     As an employee of Capital One Services, LLC, defendant BO NAN HUANG

owed fiduciary and other duties of trust and confidence to Capital One and its affiliates to

maintain the confidentiality of the material, nonpublic information he obtained during the course

of his employment. Among other things, these duties prohibited BO NAN HUANG from

disclosing or trading securities on the basis of this information.

8.     Capital One maintained written policies advising its employees that data and

information contained in Capital One's systems were "the property of Capital One and must be

treated as strictly confidential." Capital One's written policies further advised its employees that

"all nonpublic confidential and proprietary business information . . . can be used only for Capital

One's business purposes or legally authorized purposes." Capital One's policies further advised,

"If you do not have a legitimate business reason to access customer or consumer information, do

not seek to do so."

9.     Capital One also maintained written policies that advised its employees that

engaging in insider trading while in possession of material, nonpublic information was a

violation of criminal law, Capital One's policies, and a basis for termination from Capital One.

For example, Capital One's Code of Business Conduct and Ethics provided, among other things:

**Do not engage in insider trading or tipping.**

Capital One will not tolerate or excuse violations of insider trading laws. In
general, these laws prohibit buying or selling stock in any public company,
including Capital One, when you have material information that has not been
released to the public.

3

You must also refrain from communicating material nonpublic information to anyone who might use it to buy or sell securities. "Tipping" others may violate laws and can result in penalties to all parties involved, including Capital One. For additional information, see the Securities Law Policy.

Material information not available to the public may be provided only to colleagues who need the information to perform their duties. If you have access to such information, you must not use it to buy or sell related securities, stock or derivatives until the second business day after the information has been made public. Even if public announcements are made regarding inside information, you may not release information that you know is still confidential.

The same restrictions apply to trading stock of Capital One business partners; you cannot use any material nonpublic information you may obtain about their businesses for your own personal advantage or in a way that could hurt the image or reputation of Capital One. In addition, you may not communication material, nonpublic information to others who could then use the information to buy or sell securities.

When in doubt assume information is material and nonpublic, and do not act upon it. Simply put, you must not take part in any trading that may appear improper.

10.     Capital One required its employees to participate in training periodically to ensure they were aware of its Code of Business Conduct and Ethics. Both NAN HUANG and BO NAN HUANG repeatedly participated in this training.

11.     In addition to Capital One's Code of Business Ethics, Capital One maintained written Securities Law Policies that reiterated that its employees could not engage in insider trading while in possession of material, nonpublic information, and that doing so was a crime. Capital One further required its employees to participate in training periodically to ensure that they were familiar with Capital One's Securities Law Policies and the prohibition on insider trading. Both NAN HUANG and BO NAN HUANG repeatedly participated in training regarding the prohibition on insider trading.

12.     A stock option, commonly referred to as an "option," gave its holder the right to buy or sell shares of an underlying stock at a specified price, referred to as the option's "strike"

4

price, until a specified date, referred to as the option's "expiration" date. Options generally were sold in contracts that gave the option holder the right to buy or sell 100 shares of the underlying stock.

13.     A "put" option gave its holder the right, but not the obligation, to sell the underlying stock at the specified strike price until the specified expiration date. Generally, the buyer of a put option anticipated that the price of the underlying stock would decrease prior to the put option's expiration date.

14.     A "call" option gave its holder the right, but not the obligation, to buy the underlying stock at the specified strike price until the specified expiration date. Generally, the buyer of a call option anticipated that the price of the underlying stock would increase prior to the call option's expiration date.

## COUNT 1

(Conspiracy To Commit Insider Trading)

15.   Paragraphs 1 through 14 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

16.   Beginning no later than 2012, and continuing through at least January 2015, in the Eastern District of Virginia, and elsewhere,

NAN HUANG, and
BO NAN HUANG,
also known as "Bonan Huang,"

defendants herein, along with others known and unknown to the grand jury, did knowingly conspire and agree with each other to commit certain offenses against the United States, namely, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the facilities of a national securities exchange, to willfully use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in contravention of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; and (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons).

### Manner and Means of the Conspiracy

In furtherance of the conspiracy, and to accomplish its unlawful objects, the following manner and means were used, among others:

17.   It was a part of the conspiracy that NAN HUANG and BO NAN HUANG misappropriated material, nonpublic information they obtained during the course of their employment with Capital One in violation of: (a) the fiduciary and other duties of trust and

6

confidence they owed to Capital One; and (b) Capital One's express policies regarding the use and safekeeping of confidential information and prohibitions on insider trading.

18.    It was a part of the conspiracy that NAN HUANG and BO NAN HUANG accessed Capital One's nonpublic credit card and debit card transaction database and performed thousands if not tens of thousands of queries and other searches on that database to compile material nonpublic credit card and debit card transaction data of scores of publicly traded companies. NAN HUANG and BO NAN HUANG performed these queries and searches for the specific purpose of identifying, gathering, and aggregating material nonpublic information about the sales data of publicly traded companies, and not for any legitimate job-related duties they had as employees of Capital One.

19.    It was further part of the conspiracy that by conducting these queries and searches, NAN HUANG and BO NAN HUANG were able to view and analyze nonpublic, aggregated sales data for specified companies over periods of time that they could define through the parameters of the queries they performed.

20.    It was further part of the conspiracy that, by viewing and analyzing this nonpublic data, NAN HUANG and BO NAN HUANG were able to identify whether specified companies sales though Capital One's credit card and debit card network were increasing or decreasing, and thereby to project whether the companies' overall sales were increasing or decreasing, prior to that information being released publicly. NAN HUANG and BO NAN HUANG knew, moreover, that the data they had misappropriated from Capital One's credit card and debit card transaction database constituted material nonpublic information.

21.    It was further part of the conspiracy that NAN HUANG and BO NAN HUANG communicated with one another regarding methods for querying Capital One's transaction

database to better isolate and aggregate material nonpublic information that they intended to use to purchase or sell securities, including stock options.

22.     It was further part of the conspiracy that NAN HUANG and BO NAN HUANG communicated with one another regarding the material nonpublic information that they had obtained from Capital One's transaction database, as well as the securities they had identified for sale or purchase, knowing that the data constituted material nonpublic information, and knowing that the securities had been identified for sale or purchase on the basis of this material nonpublic information.

23.     It was further part of the conspiracy that NAN HUANG and BO NAN HUANG used the material nonpublic information that they had misappropriated from Capital One's credit card and debit card transaction database to buy and sell options on the stock of scores of publicly traded companies they had searched for in Capital One's database, in advance of the public earnings announcements by those companies, to the financial detriment of those on the other side of the option transactions, thereby reaping substantial illegal profits.

24.     Among others, NAN HUANG and BO NAN HUANG purchased and sold options on the stock of J.C. Penney Company, Inc. (ticker symbol "JCP"), DSW Inc. (ticker symbol DSW), Cabela's Incorporated (ticker symbol "CAB"), Coach, Inc. (ticker symbol "COH"), Outerwall Inc. (ticker symbol "OUTR"), Chipotle Mexican Grill, Inc. (ticker symbol "CMG"), Carter's, Inc. (ticker symbol "CRI"), Nordstrom, Inc. (ticker symbol "JWN"), Express, Inc. (ticker symbol "EXPR"), Guess (ticker symbol "GES"), Ulta Salon, Cosmetics & Fragrance, Inc. (ticker symbol "ULTA"), all on the basis of material nonpublic information obtained from Capital One's database.

25.    It was further part of the conspiracy scheme that NAN HUANG and BO NAN

HUANG reaped extraordinary profits from the purchase and sale of securities, including stock

options, that they made on the basis of material nonpublic information obtained from Capital

One's database.

### Overt Acts

26.    In furtherance of the conspiracy, and to effect the objects thereof, the following

overt acts were committed within the Eastern District of Virginia and elsewhere:

27.    On or about the dates identified below, in the Eastern District of Virginia and

elsewhere, the defendants identified below executed the following trades, all on the basis of

material nonpublic information:

| Approx. Date | Defendant | Transaction |
|---|---|---|
| 11/18/2013 | NAN HUANG | Purchase of approx. 800 JCP call options |
| 11/25/2013 | BO NAN HUANG | Purchase of approx. 168 DSW put options |
| 2/12/2014 | NAN HUANG | Purchase of approx. 170 CAB put options |
| 2/12/2014 | BO NAN HUANG | Purchase of approx. 19 CAB put options |
| 4/28/2014 | NAN HUANG | Purchase of approx. 230 COH put options |
| 4/28/2014 | BO NAN HUANG | Purchase of approx. 390 COH put options |
| 5/1/2014 | NAN HUANG | Purchase of approx. 100 OUTR call options |
| 5/1/2014 | BO NAN HUANG | Purchase of approx. 30 OUTR call options |
| 7/21/2014 | NAN HUANG | Purchase of approx. 52 CMG call options |
| 7/21/2014 | BO NAN HUANG | Purchase of approx. 22 CMG call options |
| 7/23/2014 | NAN HUANG | Purchase of approx. 40 CRI call options |
| 7/23/2014 | BO NAN HUANG | Purchase of approx. 18 CRI call options |
| 8/14/2014 | NAN HUANG | Purchase of approx. 200 JWN put options |
| 8/14/2014 | BO NAN HUANG | Purchase of approx. 40 JWN put options |
| 8/26/2014 | NAN HUANG | Purchase of approx. 340 EXPR call options |

| Approx. Date | Defendant | Transaction |
|---|---|---|
| 8/26/2014 | BO NAN HUANG | Purchase of approx. 255 EXPR call options |
| 8/27/2014 | NAN HUANG | Purchase of approx. 70 GES put options |
| 8/27/2014 | BO NAN HUANG | Purchase of approx. 10 GES put options |
| 9/11/2014 | NAN HUANG | Purchase of approx. 20 ULTA call options |
| 9/11/2014 | BO NAN HUANG | Purchase of approx. 30 ULTA call options |

(In violation of Title 18, United States Code, Section 371.)

## COUNTS 2 – 21

(Insider Trading)

THE GRAND JURY FURTHER CHARGES THAT:

28.     Paragraphs 1 through 14 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

29.     Beginning no later than 2012, and continuing through January 2015, in the Eastern District of Virginia, and elsewhere,

NAN HUANG, and
BO NAN HUANG,
also known as "Bonan Huang,"

defendants herein, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the facilities of a national securities exchange, willfully used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in contravention of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; and (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons.

30.     The devices, schemes, and artifices to defraud, and the acts, practices, and courses of business conduct that operated and would operate as a fraud are described in paragraphs 17 through 25 of this Indictment, which paragraphs are re-alleged and incorporated as if fully set forth herein.

31.     On or about the dates listed below, in the Eastern District of Virginia and elsewhere, the defendants identified below, in connection with the purchase and sale of securities identified below, used and caused the use of a facility of a national securities exchange:

11

| Count | Approx. Date | Defendant Charged | Transaction |
|---|---|---|---|
| 2 | 11/18/2013 | NAN HUANG | Purchase of approx. 800 JCP call options |
| 3 | 11/25/2013 | BO NAN HUANG | Purchase of approx. 168 DSW put options |
| 4 | 2/12/2014 | NAN HUANG | Purchase of approx. 170 CAB put options |
| 5 | 2/12/2014 | BO NAN HUANG | Purchase of approx. 19 CAB put options |
| 6 | 4/28/2014 | NAN HUANG | Purchase of approx. 230 COH put options |
| 7 | 4/28/2014 | BO NAN HUANG | Purchase of approx. 390 COH put options |
| 8 | 5/1/2014 | NAN HUANG | Purchase of approx. 100 OUTR call options |
| 9 | 5/1/2014 | BO NAN HUANG | Purchase of approx. 30 OUTR call options |
| 10 | 7/21/2014 | NAN HUANG | Purchase of approx. 52 CMG call options |
| 11 | 7/21/2014 | BO NAN HUANG | Purchase of approx. 22 CMG call options |
| 12 | 7/23/2014 | NAN HUANG | Purchase of approx. 40 CRI call options |
| 13 | 7/23/2014 | BO NAN HUANG | Purchase of approx. 18 CRI call options |
| 14 | 8/14/2014 | NAN HUANG | Purchase of approx. 200 JWN put options |
| 15 | 8/14/2014 | BO NAN HUANG | Purchase of approx. 40 JWN put options |
| 16 | 8/26/2014 | NAN HUANG | Purchase of approx. 340 EXPR call options |
| 17 | 8/26/2014 | BO NAN HUANG | Purchase of approx. 255 EXPR call options |
| 18 | 8/27/2014 | NAN HUANG | Purchase of approx. 70 GES put options |
| 19 | 8/27/2014 | BO NAN HUANG | Purchase of approx. 10 GES put options |
| 20 | 9/11/2014 | NAN HUANG | Purchase of approx. 20 ULTA call options |
| 21 | 9/11/2014 | BO NAN HUANG | Purchase of approx. 30 ULTA call options |

(In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.)

## COUNT 22

(Engaging in Monetary Transactions in Criminally Derived Property)

THE GRAND JURY FURTHER CHARGES THAT:

32.    On or about January 7, 2014, within the Eastern District of Virginia, defendant NAN HUANG knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, namely, the withdrawal in and affecting interstate commerce of $30,000 in funds from an account at Barclays Bank of Delaware, N.A., a financial institution, account number ending in 7937, which funds were used to purchase 15,000 units of interest in The Seaweed Bath Co., LLC, and which funds were derived from specified unlawful activity, namely, the proceeds of the insider trading conspiracy alleged in Count 1 of this Indictment, and the insider trading scheme alleged in Count 2 of this Indictment.

(In violation of Title 18, United States Code, Section 1957.)

## COUNT 23

(Engaging in Monetary Transactions in Criminally Derived Property)

THE GRAND JURY FURTHER CHARGES THAT:

33.      On or about March 4, 2014, within the Eastern District of Virginia, defendant NAN HUANG knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, namely, the withdrawal in and affecting interstate commerce of $76,000 in funds from an account at Barclays Bank of Delaware, N.A., a financial institution, account number ending in 7937, which funds were used to purchase 4,000 shares of Series B preferred stock in Smari Organics, Inc., and which funds were derived from specified unlawful activity, namely, the proceeds of the insider trading conspiracy alleged in Count 1 of this Indictment, and the insider trading scheme alleged in Counts 2 and 4 of this Indictment.

(In violation of Title 18, United States Code, Section 1957.)

## COUNT 24

(Engaging in Monetary Transactions in Criminally Derived Property)

THE GRAND JURY FURTHER CHARGES THAT:

34.     On or about March 17, 2014, within the Eastern District of Virginia, defendant

BO NAN HUANG, also known as "Bonan Huang," knowingly engaged in a monetary

transaction in criminally derived property of a value greater than $10,000, namely, the

withdrawal in and affecting interstate commerce of $25,000 in funds via check number 154

drawn on an account at Capital One, N.A., a financial institution, account number ending in

5212, which funds were used as a down payment for the purchase of real property at 4909

Westward Terrace, Glen Allen, Virginia 23059, and which funds were derived from specified

unlawful activity, namely, the proceeds of the insider trading conspiracy alleged in Count 1 of

this Indictment, and the insider trading scheme alleged in Counts 3 and 5 of this Indictment.

(In violation of Title 18, United States Code, Section 1957.)

## COUNT 25

(Engaging in Monetary Transactions in Criminally Derived Property)

THE GRAND JURY FURTHER CHARGES THAT:

35.     On or about May 13, 2014, within the Eastern District of Virginia, defendant NAN HUANG knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, namely, the withdrawal in and affecting interstate commerce of $100,000 in funds from an account at Barclays Bank of Delaware, N.A., a financial institution, account number ending in 7937, which funds were used to purchase 464 shares of Series A-1 preferred stock in Hylete, LLC, and which funds were derived from specified unlawful activity, namely, the proceeds of the insider trading conspiracy alleged in Count 1 of this Indictment, and the insider trading scheme alleged in Counts 2, 4, 6, and 8 of this Indictment.

(In violation of Title 18, United States Code, Section 1957.)

## COUNT 26

(Engaging in Monetary Transactions in Criminally Derived Property)

THE GRAND JURY FURTHER CHARGES THAT:

36. On or about October 28, 2014, within the Eastern District of Virginia, defendant BO NAN HUANG, also known as "Bonan Huang," knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, namely, the withdrawal in and affecting interstate commerce of $133,977.75 in funds from an account at Bank of America, N.A., a financial institution, account number ending in 5331, which funds were used to purchase real property at 4909 Westward Terrace, Glen Allen, Virginia 23059, and which funds were derived from specified unlawful activity, namely, the proceeds of the insider trading conspiracy alleged in Count 1 of this Indictment, and the insider trading scheme alleged in Counts 3, 5, 7, 9, 11, 13, 15, 17, 19, and 21 of this Indictment.

(In violation of Title 18, United States Code, Section 1957.)

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT THE PROPERTY

DESCRIBED BELOW IS SUBJECT TO FORFEITURE:

37.     Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendants NAN

HUANG and BO NAN HUANG, also known as "Bonan Huang," are hereby notified that, if

convicted of an offense alleged in Counts 1 through 21 of this Indictment, the defendants shall

forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), their

interest in any property, real or personal, constituting or derived from proceeds obtained directly

or indirectly as the result of the Counts of conviction.  If convicted of an offense alleged in

Counts 22 through 26, the defendants shall forfeit to the United States, pursuant to 18 U.S.C.

§ 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to

such property.  If property subject to forfeiture cannot be located, the United States will seek an

order forfeiting substitute property, including but not limited to the following:

      a.      15,000 shares of stock in The Seaweed Bath Co., held in the name of NAN HUANG (which shares were derived from 15,000 units of interest in The Seaweed Bath Co., LLC, held in the name of NAN HUANG);

      b.      4,000 shares of Series B preferred stock in Smari Organics, Inc., held in the name of NAN HUANG;

      c.      324,800 shares of Series A-1 preferred stock in Hylete, Inc. held in the name of NAN HUANG (which shares were derived from 464 shares of Series A-1 preferred stock in Hylete, LLC, held in the name of NAN HUANG); and

      d.      A sum of money equal to at least $6,698,242 in United States currency, representing the amount of proceeds obtained as a result of the offenses.

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1);

Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal

Procedure.)

G. Zachary Terwilliger
United States Attorney

By:  _____
Matthew Burke
Assistant United States Attorney

A TRUE BILL Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
FOREPERSON OF THE GRAND JURY

19